J-S37002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : : : | |
| APPEAL OF: N.B., MOTHER | : : : : : | |
| | : | No. 418 EDA 2019 |

Appeal from the Order Entered January 3, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000721-2018

BEFORE:  BOWES, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 22, 2019**

Ni.B.[1] ("Mother") appeals from the January 3, 2019 permanency review order that adjudicated her a perpetrator of child abuse against her son, N.B., pursuant to 23 Pa.C.S. § 6303(b.1)(3).  We affirm.

N.B. was born during February 2007.  Over the course of this case, doctors diagnosed N.B. with varying combinations of post-traumatic stress disorder ("PTSD"), chronic oppositional defiant disorder, attention deficit hyperactivity disorder ("ADHD"), conduct disorder, and unspecified depressive disorder.  As determined by the trial court, "On February 17, 2018, Mother took [N.B.] to KidsPeace Psychiatric Hospital . . . because he was displaying aggressive behaviors at home.  The [c]hild was physically aggressive toward

---

[1] As N.B. and his mother share identical initials, we identify the mother as Ni.B.

his siblings, and he punched holes in several walls throughout the home."
Trial Court Opinion, 3/15/19, at 2. Thereafter, on March 12, 2018, the
Department of Human Services ("DHS") received a child protective service
("CPS") report citing Mother's "[r]efusal of [a]ppropriate [t]reatment" as the
grounds for abuse or neglect. CPS Report, 3/12/18, at 2. Specifically, the
CPS report asserted, *inter alia*, that Mother impeded his participation in
therapy and interfered with N.B.'s mental health treatment by refusing to
permit KidsPeace to administer prescribed medication to address his
uncontrolled aggression, which required him to be restrained two to three
times per day. While Mother initially consented to the hospital's
administration of Thorazine, as needed, she refused to consent to additional
medication. Among her objections to treatment, Mother complained that she
did not want her son to be treated like "a guinea pig by taking med[ication]."
*Id*. at 3. On at least one occasion, Mother attempted to abscond with her son
and return home with the child.

DHS filed a dependency petition on March 29, 2018, based upon
Mother's alleged medical neglect. Two weeks later, it filed an amended
dependency petition to incorporate a subsequent order of protective custody
that the court issued on April 6, 2018, in relation to Mother's demand that the
facility discharge N.B. to her care. Between February 2018 and December
2018, N.B. was transferred to five separate facilities due to Mother's
interference in her son's treatment: KidsPeace; Horsham Clinic; Warwick

House; Belmont Crisis Stabilization Unit, and Devereux Acute Psychiatric Hospital.

Meanwhile, on July 26, 2018, the juvenile court adjudicated N.B. dependent, removed him from Mother's care, transferred legal custody to DHS, and continued residential placement in the Horsham Clinic for behavioral health treatment. While Mother did not dispute the dependency adjudication, she continued to contest the allegations of child abuse. However, having conducted evidentiary hearings concerning the abuse allegations on June 26, 2018 and July 16, 2018, the juvenile court held its child-abuse determination in abeyance until a later permanency review hearing.

During the subsequent permanency hearing on January 3, 2019, DHS closed its case as to abuse, and Mother testified on her own behalf. At the close of evidence, the trial court determined that DHS presented clear and convincing evidence to establish that Mother perpetrated child abuse pursuant to the Child Protective Services Law ("CPSL"), 23 Pa.C.S. § 6303(b.1)(3), by causing or substantially contributing to N.B.'s serious mental injury.

Mother filed a timely notice of appeal and a concomitant concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the trial court entered its opinion. The matter is ready for our review. Mother presents one issue:

> Whether the trial court abused its discretion and committed reversible error when it made a finding that the child was a victim of child abuse by appellant/mother as defined at 23 Pa.C.S. 6303, where such determination was not supported by clear and

- 3 -

convincing evidence under the child protective services law, 23 Pa.C.S. 6303 (b.1).

Appellant's brief at 7.[2]

We recently reiterated our standard of review of a finding of child abuse in a dependency case as follows:

> The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.
>
> *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).
>
> While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, the [CPSL] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence.  *See In the Interest of J.R.W.*, 631 A.2d 1019 (Pa.Super. 1993).  As the Supreme Court explained in *In the Interest of L.Z.*, *supra* at 1176, "[as] part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

*In The Interest of T.G.*, 208 A.3d 487, 490 (Pa.Super. 2019).

Instantly, DHS's petition for an adjudication of dependency asserted that Mother committed child abuse by persistently interfering with N.B.'s

---

[2] Deborah A. Fegan, Esquire, counsel for N.B., joined the brief DHS filed in support of the trial court's adjudication of Mother as a perpetrator of child abuse.

mental health treatment. In pertinent part, the CPSL defines child abuse as follows:

> (b.1) Child abuse.— The term "child abuse" shall mean intentionally, knowingly, or recklessly any of the following:
>
> . . . .
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

23 Pa.C.S. § 6303(b.1)(3).

Additionally, "serious mental injury" is defined as: "A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that: . . . seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks." 23 Pa.C.S. § 6303(a).

Specifically, the agency cited Mother's refusal of appropriate treatment as the grounds for abuse. *See* DHS CPS Report, 4/9/18, at 2. The April 2018 CPS report included a narrative statement outlining DHS's allegations that "[M]other has been refusing medication to treat his conditions [and that she previously] took him off [medication] because she saw increased aggression and hallucinations with it." *Id* at 4.

On appeal, Mother raises three arguments to support her assertion that the trial court erred in adjudicating her a perpetrator of abuse under § 6303(b.1)(3): (1) she was denied due process; (2) her actions were not

harmful to N.B.; and (3) she lacked the requisite state of mind. **See** Mother's brief at 23-24, 25-27, 28-29. We address the issues *seriatim*.

The first component of Mother's argument is that the trial court denied her due process of law in considering evidence of her interference with N.B.'s mental health treatment beyond the allegations in March 12, 2018 CPS report. The fundamental requirements of due process are notice and the opportunity to be heard in a tribunal with jurisdiction. **In re: Adoption of J.N.F.**, 87 A.2d 775, 781 (Pa.Super. 2005). Accordingly, Mother contends that the court violated her right to due process by considering acts and omissions that were not included in the March 2018 report.

Unfortunately for Mother, any issue regarding this element of due process is waived because she neglected to assert it in her Rule 1925(b) statement. Although Mother enumerated four issues in her concise statement, she did not object to the scope of DHS's inquiry into the allegations of abuse, and she made only a single reference to due process generally:

> The trial court made reversible error and showed bias against appellant in preventing appellant from addressing lines of questions regarding appellant's understanding of her child's treatment, medication, and diagnosis. In facing allegations regarding child abuse, admission of evidence based on appellant's understanding and mindset is relevant and necessary for the court to make a fair determination and preventing appellant from admitting this evidence violated Commonwealth and Federal Due Process.

Rule 1925(b) Statement, 1/3/19 at 1-2. The trial court rejected her due process argument because it was vague and unspecific. It reasoned, "This

[c]ourt cannot speculate as to what Mother's allegations are. . . . Mother was never denied the opportunity to participate, testify, present evidence on her own behalf, and cross examine witnesses." Trial Court Opinion, 3/15/19, at 35-36. As Mother failed to include in her Rule 1925(b) statement her current allegation that the trial court violated her due process by considering evidence beyond the scope of the March 12, 2018 CPS Report, that claim is waived. *See* Pa.R.A.P. 1925(b)(4)(vii) (issues not included in Rule 1925(b) statement are waived).

Next, we address Mother's argument that her actions were not harmful. Mother contends that the finding of child abuse cannot be predicated on her refusal of appropriate treatment for her son because two instances of her meddling did not result in any direct harm to the child. The first component of this argument invokes the testimony of Robert Kovar, M.D., the attending psychiatrist at the Horsham Clinic, who indicated that the Zoloft regimen that Mother eventually permitted the clinic to administer ultimately proved to be ineffective. She argues that, if the medication was ineffectual, her refusal to consent to that treatment was not tantamount to child abuse because her son was not harmed. She levels a similar argument with regard to the fact that she threatened to unilaterally remove N.B. from the Horsham Clinic, although she did not do so after DHS intervened and obtained a temporary order of protective custody on April 6, 2018.

Neither the fact that N.B.'s condition was not responsive to Zoloft nor the fact that DHS intervened to neutralize Mother's threats to remove him from care negate the reality that Mother's behavior placed N.B. at risk in the first place. Mother is not entitled to reap the benefit of the unexpected results of her abuse. Indeed, the refusal of treatment is tantamount to a "serious mental injury" when the refusal "seriously interferes with a child's ability to accomplish age-appropriate development[t.]" 23 Pa.C.S. § 6303(a). Taken to its logical conclusion, Mother's position would countenance a parent's decision to intentionally create a legitimate risk of serious injury to a child simply because the injury never materialized. That conclusion is untenable. A perpetrator of child abuse is not rewarded for serendipitous consequences that permit the victim to avoid injury or the opportune intervention of others. Thus, Mother is not entitled to relief on this basis.

In any event, despite the fortuitous outcomes on the two occasions Mother references in her brief, as we discuss *infra*, the record is replete with examples that illustrate how Mother's persistent interference with her son's mental health treatment regimen caused or contributed to his serious mental injury. In concluding that N.B. was the victim of abuse due to Mother's contribution to his serious mental health injury, the trial court considered testimony presented by Mother, the DHS investigator assigned to the case, the CUA case manager, an independent psychologist, and several mental

health professionals that treated N.B. as he was shuffled among four different facilities over a ten-month period.

In this vein, noting its familiarity with the recurrent nature of Mother's diminishing support of her son's treatment regime, the court opined, "It's uncanny how this case keeps recycling back again, and it all turns on what I perceive to be an unhealthy influence of the mother on the child. . . . When the mother decides that she's not going to comply and she's not going to work with staff[,] then she turns on the staff and the child is a victim of that activity." N.T., 12/19/18 at 35. The court subsequently reiterated, "When the mother decides she's going to cooperate everything is fine, she can be an asset. . . . This time she was [an asset] up until a certain point and then she became a liability." *Id*. at 37.

The trial court subsequently provided the following summary of reasons for its conclusions:

> On the issue of credibility, Mother's testimony is not credible, and her testimony was the result of either purposeful deceit or a disconnect from reality. When it came time to confront the issue of numerous testimonies that were offered by various individuals involved with [N.B.], Mother said they all lied about their interactions with her. On the other hand, various treatment professionals provided testimony that directly conflicted with Mother's testimony, and they testified they could not properly treat [N.B.] while Mother is involved because of her behavior and obstructionism. As a result[,] this Court entered stay-away orders restricting Mother's contact, and the Court heard evidence that the Child responded in a positive manner to treatment when contact with Mother was restricted.
>
> This [c]ourt is familiar with the family and has presided over numerous hearings of this [N.B.], who has been diagnosed with

Post-Traumatic Stress Disorder, Chronic Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder combined type, and exhibits aggressive abusive behavior toward his peers, caregivers, and also towards his family. It is true that Mother voluntarily sought mental health treatment for her son, however, once treatment began, her anger, mistrust, aggressive behavior and actions, and possible mental health issues have impeded the therapy of the [N.B.].

This [c]ourt reasoned that sufficient, clear and convincing evidence was presented on the record that Mother has substantially contributed to the serious mental health injury of the [N.B.] pursuant to 23 Pa.C.S.A. 6303 (b.1)(3).

Trial Court Opinion, 3/15/19, at 36-37. As highlighted in the following narrative, our review of the certified record supports the trial court's findings of fact in regard to § 6303(b.1).

While N.B. was at KidsPeace, the first stop in his ten-month ordeal, Mother became combative with the medical team, rebuffed their attempts to discuss medical intervention, and vehemently objected to the hospital administering medication. For example, overlooking that she consented to the administration of Thorazine "as needed" to treat N.B.'s volatile behavior, Mother assailed KidsPeace for allegedly administering the medication to her son without authorization. At that point, Mother lost trust in KidsPeace, threatened to withdraw her son from treatment, and declared that she would withhold consent unless N.B. was moved to another facility.

On March 27, 2018, N.B. was transferred from KidsPeace to the Horsham Clinic, an inpatient behavioral health facility. However, after initially consenting to the administration of Zoloft at the facility, she interfered with

- 10 -

N.B.'s medication and treatment, going so far as to advise the child to disobey the Horsham Clinic staff.[3]  Upon being confronted about her obstinacy, Mother threatened to enlist family members to physically assault the staff.

During the six months that N.B. was at the Horsham Clinic, Mother agreed to permit a gradual increase in the dosage of Zoloft to target her son's PTSD, and with the staff's dogged pursuit of treatment, she eventually allowed the clinic to administer Prazosin for the child's nightmares.  Nevertheless, she persistently rebuffed medication to treat his ADHD.  Mother was confrontational with staff members and repeatedly complained that N.B. was being mistreated and targeted unfairly for restraints.  Ultimately, the treating physician determined that the Horsham Clinic could not continue to treat N.B. due to Mother's behavior, and he opined that the child would not improve so long as Mother continued to mistrust the treatment facility.

N.B.'s then-attending psychiatrists at the Horsham Clinic drafted a letter summarizing the consequences of Mother's interference in her son's mental health treatment.  In pertinent part, the letter reads,

> It has been difficult working with [N.B.]'s mother regarding medications; initially she had agreed . . . . [to] allow him to be treated with medications.  However, in the first conversations with the psychiatrist she became angry when the topic was brought up and [she] didn't agree to med[ication].  . . .  [S]he was argumentative, brought up multiple other issues, and seemed to

---

[3] On April 5, and 15, 2018, N.B. leveled allegations of physical abuse against two different members of the Horsham Clinic staff.  CPS reports were generated for the respective allegations.  Both reports were deemed unfounded.

misinterpret and misrepresent things that were said. In addition, the tone of the conversations has no doubt made it difficult to collaborate on her son's care. **There has clearly been a delay in his** . . . **treatment due to her difficulty in interacting with the healthcare professions**, just since he came to Horsham (according to records this plagued the month-long Kids[P]eace hospitalization as well).

[Mother's] **behavior has also made treatment difficult on a broader scale in that she is frequently angry and argumentative with staff** and [misdirected] the focus [of treatment from N.B.'s] dangerous behaviors, which have continued during this hospitalization and they did at home and at KidsPeace. **This has likely had the effect of worsening his behavior** and giving him the message that he can externalize blame for his aggression. **His behavior is more dangerous in the context of his mother not supporting the treatment plan in his presence and unlikely to change**.

N.T., 6/26/18, 101 (DHS Exhibit 4) (emphases added).

During late September 2018, N.B. was transferred to the Warwick House, a residential treatment facility operated in Philadelphia. Again, Mother was initially forthcoming and cooperative with the facility. However, those positive interactions were ephemeral. Over the ensuing nine weeks, N.B.'s behavior deteriorated proportionately to Mother's distrust of the staff, who ultimately determined that Mother impeded N.B.'s progress. By December 2018, when N.B. was sent to the Belmont Crisis Stabilization Unit due to repeated outbursts against residents and staff, Warrick was no longer willing to treat him because he posed a threat to the staff's safety. Predictably, when the Warrick staff spoke to Mother about her son's deterioration, Mother became defensive, disrespectful, and hostile. Jeffery Friedmen, Ph.D, Warrick's Director of Clinical Services, testified that Mother's quarrelsome

behavior affected her son directly. Stating that "[a]s soon as he is aware the mom's upset with people . . ., it almost gives him permission to act [out] as [if he were] bullet proof." N.T., 12/19/18, at 13.

The juvenile court twice suspended Mother's visitations with N.B. because she was interfering with the child's stability. The first suspension spanned between June 26, 2018 and October 2018. Thereafter, following a brief period when visitation was permitted, on December 19, 2018, the court issued a no-contact order, which remained in effect through the date that Mother filed the present appeal. Two days after the court entered the no-contact order, N.B. was admitted to Devereux Acute Psychiatric Hospital for approximately one month. Now, free of Mother's interference, N.B. has resided at the Brandywine Residential treatment facility since January 24, 2019. All of the foregoing evidence, which we gleaned from the certified record, supports the trial court's finding that Mother's refusal of appropriate treatment substantially contributed to N.B.'s mental-health problems insofar as it seriously interfered with the child's ability to accomplish age-appropriate developmental and social tasks.

Finally, we address Mother's contention that DHS failed to establish that she possessed the requisite state of mind to commit child abuse. This claim fails for at least two reasons. First, while Mother asserts that her intentions were well-meaning and suggests that she acted in her son's best interest, her actions were so contrary to reality that they were, at a minimum, reckless.

While Mother argues that her recklessness "could not result in abuse under the Act," she is wrong. Mother's brief at 27. The CPSL clearly states, "The term 'child abuse' shall mean intentionally, knowingly or **recklessly** . . . [c]ausing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act." 23 Pa.C.S. § 6303(b.1)(3) (emphasis added). Indeed, Mother's accompanying argument is not that recklessness is not an element of the definition of child abuse, but rather, that, under the circumstances of this case, her persistent interference with her son's treatment was not tantamount to recklessness. Again, we disagree.

The CPSL incorporates the statutory definition of recklessness that our legislature outlined in § 302(b)(3) of the Crimes Code relating to the general requirements of culpability. **See** 23 Pa.C.S. § 6303(a) ("The term [recklessly] shall have the same meaning as provided in 18 Pa.C.S. § 302."). Pursuant to the relevant definition,

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3).

Instantly, the preceding narrative delineating Mother's refusal of appropriate treatment establishes her conscious disregard of a substantial and

- 14 -

unjustifiable risk of harm to N.B.'s mental health, the foundational tenet of recklessness, and it epitomizes a gross deviation from the standard of conduct that a reasonable person would observe in her situation. No relief is due.

Furthermore, Mother's assertion fails because the trial court flatly rejected her proffered justification for interfering with N.B.'s treatment, *i.e.*, that the facilities were abusive toward N.B. and neglected to document a need for the recommended treatment. Trial Court Opinion, 3/15/19, at 33. In light of the trial court's express rejection of Mother's credibility, which the certified record supports, we do not discern an abuse of discretion in the trial court's determinations that Mother behaved recklessly and substantially contributed to N.B.'s serious mental injury in a manner that was tantamount to child abuse as the term is defined in § 6303(b.1)(3).

At its core, Mother's protestation is an attempt to have this Court supplant the trial court's credibility determinations and re-weigh the evidence in her favor. However, that entreaty ignores our well-ensconced standard of review. As noted *supra*, this Court is limited to determining whether the trial court abused its discretion in making its conclusions. **See In The Interest of T.G.**, **supra** at 490 (appellate court must accept findings of fact and credibility determinations supported in record). Accordingly, Mother's claim of justification is unpersuasive.

For all of the foregoing reasons, the certified record supports the trial court's conclusion that Mother substantially contributed to N.B.'s serious

mental health injury by refusing appropriate treatment. Thus, we affirm the permanency review order that adjudicated Mother the perpetrator of child abuse as the term is defined in 23 Pa.C.S. § 6303(b.1)(3).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/19